Good morning. May it please the Court. My name is Lynn Hardfield and I represent the appellant Jason Garcia. This case goes to the heart of what the commission intended relevant conduct guideline to cover. The relevant conduct guideline is a mechanism by which the sentencing court can take into account uncharged conduct and enhance the defendant's base offense level based on that conduct. This case looks at what the sentencing commission was intending and what limitations they were intending to place on its use. Now, the court in this case erred by using an unrelated year-old arrest that was simultaneously being handled by state authorities to significantly increase Mr. Garcia's guideline range. Can we start with the same issue that took a lot of the time in the last case? How did you, did you ever argue, excuse me, whoever handled it, did the defendant ever argue in district court that the 2016 arrest was not relevant conduct? Um, obliquely is what I would say. I think the objection was sufficient. It wasn't as good as it could have been. What the district court lawyer did was to object to the use of that arrest, um, or to the use of, yes, to the, it was, it was a criminal history calculation. Um, the criminal history. There was an objection to using that arrest, but not on the ground that it was not relevant conduct. I didn't see that. It was that it, but it did object to the timeframe. So what the district court lawyer objected to was, um, this enhancement under the guidelines for committing the instant offense while under a criminal justice sentence. And what the lawyer said was that criminal justice sentence ended on X date. And that date was after the 2016 incident that was considered relevant conduct. Right. So that was, that was a perfectly fine argument that actually prevailed. Right. But then the PSR, the probation office used that arrest in a different context under different parts of the guidelines. They treated it as relevant conduct, which led to some enhancements. And the objection that was made before didn't go to that issue. And not clear to me how your client preserved an argument that that was relevant conduct, that that was not relevant conduct. And therefore, all we could review for is plain error. Well, certainly with respect to the number of guns, guns enhancement, I would agree that that has to be reviewed for plain error. With respect to the criminal history calculation, I would, I would argue that, um, that was sufficiently preserved. Both of them, of course, involve the underlying determination about the relevant conduct. Well, then how is it preserved? I mean, if it all hinges on the relevant conduct, then would you stand or fall on relevant conduct as it relates to each one? I mean, it doesn't matter. I mean, if you, if you don't win on relevant conduct, you lose on the both underlying ones, don't you? That's correct. Okay. So we look at relevant conduct for plain error and then go from there. Yes. Um, in any event, the guidelines make plain that in order to qualify as relevant conduct, they have to, the conduct has to either be part of a common scheme or plan, or it has to be part of the same course of conduct. Um, now this, I don't think anybody here is contending this was part of the common scheme or plan, but just to go through the factors, there's no common victims, no common accomplices, no common purpose and no similar modus operandi. So we're looking at the second prong, which is the same course of conduct, which has to have sufficient connection to show that it's part of a single episode, spree or ongoing series of offenses. Um, now the guideline commentary says that in order to make that determination, you have to look at three things. You have to look at the degree of similarity between the offenses, you have to look at the regularity, the number of repetitions of the offense, and you have to look at the temporal, temporal proximity. And they also say that if one of those factors is extremely weak, then you have to have strong evidence on the other two factors. So here what the Court did was they gave, uh, the Court gave a conclusory statement that there was more or less a continuous course of conduct over an extended period of time involving possession of firearms in different contexts. And then acknowledged that there was a very long, almost a year, um, lapse between the two incidents. So looking at that, um, there's no, you go ahead, after you. There might have been a year lapse between the two incidents, but the girlfriend testified he had possessed the weapon six months earlier. So you have a six month gap followed by a six month gap. Do you not? Well, um, the girlfriend, first of all, that wasn't testimony. That was just something that was in the PSR. But that statement is really problematic, because in order to use that statement. Well, let me ask you about that real fast, and then you can finish the, so, um, it was in the PSR. Did, was there an objection to the Court using that? Because the Court did bring it up. No. Okay. Go ahead. Um, but that statement is problematic, because in order to use that statement, you have to simultaneously believe she is lying and telling the truth at the same time. And that's what makes that statement so unreliable. Um, the girlfriend made that statement when she was taking back her statement that he had the rifle out that day. She said, no, wait, he hasn't had the rifle. I haven't seen him with it in six months. So, of course, the police want to believe that she's lying there and that he did, in fact, have the rifle out that day. Um, but they also seem to want to believe she's telling the truth when she says that he had, she hadn't seen it in six months. And I don't, I don't think that's credible evidence of a pattern, um, that's, that meets the standard of reliability that we need to apply a guideline enhancement. Well, consistent with Judge Carson's statement, that was an objective too below. And so, uh, that's, we, we're stuck with that. I mean, that's, that's in the PSR. It's a factual finding that she said that. And that, why shouldn't that control as it relates to looking at the temporal gap involved here? Well, we may be stuck with it, but this Court can certainly, um, review whether it is strong evidence or not of regularity. It's a fact. I mean, the Court accepted it as a fact. There is no contest to it being a fact, so it's a fact. Um, I, you know, what I would say is that the Court is supposed to look at the strength of the evidence of similarity, regularity, and temporal proximity. And given that statement, given the context in which that statement was made, um, I would say that's weak, weak, weak evidence of regularity. Um, furthermore... If you're reviewing a plain error, then you need some clear authority, clear precedent saying that that's not enough. Is there any? Well, the D'Amato case is the most comprehensive case that this Court has. Um, and what D'Amato says is that you can only look at instances between the fugitive relevant conduct and the offensive conviction. So here what we have is this 2016 incident. We have the 2017 offensive conviction. And then we have weak evidence that maybe he might have possessed this gun six months in between. Um, that, that is not evidence of regularity under the case law. Um, they say two incidents is the outer limit, so it's not strong evidence. It's, I mean, everything is on a sliding scale, but that's not strong evidence of regularity under the case law. Wouldn't it be three incidents? Excuse me? Wouldn't it be three incidents? The arrest a year ago, the possession, the girlfriend testified about six months earlier, and then this. Wouldn't that be three incidents? Um, you know, again, it's, it depends on whether you count the fugitive relevant conduct or not. If you're counting the fugitive relevant conduct, then it would be three instances. But the case law would say that that's fairly, fairly weak evidence of regularity. Furthermore, there was no discussion whatsoever of similarity. Um, and D'Amato, which is, I think, again, the most comprehensive opinion, says even when you've got the same drugs and the same players, that's not enough to make a strong showing of similarity. Here, all we have is the name of the defendant and the name of the charge. That's it. Do we also have a precedent saying that possession of a farm on separate occasions were, was identical conduct? Um, you know, that's, we don't really have that precedent. I'm not sure which case you're referring to. I know that the government cited a case, um, and I, I didn't get that. I mean, what the government cited is many cases where the court ended up concluding that, that something was relevant conduct, but didn't go through the various factors, and may have thought one factor was weak, in fact, but concluded that because the other factors were strong, um, that something did qualify as relevant conduct. Well, if, if the defendant had a pattern, and what we're talking about is a pattern of the conduct at issue in the offensive conviction, if he had a pattern of, as a felon possessing a firearm, why is that not similarity, and why is that not a problem? Well, I, you know, I think that when we look at the case law of D'Amato, uh, the Fifth and Sixth Circuit cases also say this, Amerson and Culverhouse. They rejected the premise that just because it's the same charge, that that's enough to satisfy similarity. It's the same conduct. So we need something more. Well, I, I think in these instances, it's not really the same conduct. I mean, because with the first instance, he's outside, he's minding his own business, the cops come up and bother him, and they ask him if he has a weapon. He says, yes, I do. It's on his person. Um, that's very different than finding a firearm under the bed in someone's house. Isn't the conduct of having a weapon? Well, I mean, regardless of where you are and what you're doing with it. Well, looking at the drug cases, the conduct could be selling drugs, or it could be selling cocaine in kilo quantities to this syndicate. Um, I think when we're looking at similarity, we're looking at the, are they, what drug are they selling? Who are they selling it to? Where are they selling it? Those are the cases when they're talking about similarity, as opposed to just, well, he's selling drugs, he might be selling marijuana. In Wendell, U.S. v. Wendell, 74, Federal Court of Third, 997. Well, in Wendell, there was. There were several firearm offenses over a relatively short period of time, but we said that the offenses, and the details of the offense were not described in the opinion. We said the offenses were not merely similar, but identical. That, that's to say that it's plain error here to say that these three offenses were similar, were relevant, were related, excuse me. Uh, that seems like a, this case presents a really serious obstacle to that, to arguing that it's plain error to say that these three are related when we seem to have said that several different offenses involving possession of a firearm by a convicted felon were identical when we didn't go into the details. Well, you know, I think that the Wendell opinion is difficult because there is no detail. Right. You know, it might be that every single time this person was found in the same location with the same exact gun. But more than that, that case was an easy case because we had five times in a four or five-month period. And I think that the difficulty with these cases is that when you look at the conclusion as opposed to the analysis, if they don't tell you very much, it's obvious that Part of the analysis was whether they were similar. Then there's the temporal component also. With respect to whether they were similar, we said they're not really similar. They're identical. Well, I think you've got a problem there. You've done as well as you can do. I have to agree to disagree then. With respect to the regularity prong, I think we've gone through that. The temporal proximity prong, every case that's looked at, the wide range of cases, has said the outer limit of temporal proximity is nine months. And we also have at least one case, Cuthbertson, noting that although it's not dispositive, the temporal proximity is the most significant consideration. So when you look at all these things, we've got one other incident. There was no discussion by the Court whatsoever of this other possible possession that the girlfriend talked about when she was trying to recant her statement. And we have completely different circumstances under which the guns were possessed. So under those circumstances, we'd say that that's plain error. I only have a little bit of time, and I'd like to reserve that for rebuttal and discussing substance of reasonableness. Well, no, if you're going to raise a new issue, you don't wait until the other side. You need to do that now. I just want to briefly state that although this Court owes deference, of course, to the district court, this Court is not a rubber stamp. The Sentencing Commission statistics demonstrate that this was a wildly out-of-whack variance. It was much, much higher than the average or the mean or the median or even whether people get a variance at all. And I'd note that the government did not ask for a variance. Thank you. Just for future reference to everybody, rebuttal time is not to raise a new argument. May it please the Court, Stephen Kreger on behalf of the United States. As Mr. Garcia has already conceded that we're under plain error, we'll avoid talking about the standard review. As has been discussed, whether something falls within the same course of conduct is reviewed under a three-factor test, similarity, regularity, and temporal proximity. The suggestion is that similarity is lacking here, or at least it's not as strong as the government suggests. We disagree. One, as Judge Hartz mentioned, the Wendell case says where you have possession of firearms offenses, they're not merely similar, they're identical. But beyond that, we have more than just he possessed a firearm. We have the fact that he possessed a chamber-loaded firearm, a firearm that was ready to be used in both instances. We have the fact that he was with his girlfriend in both instances. We have the fact that he was in Oklahoma City in both instances. And while the city might not necessarily be the strongest indication, while he was out on his motorcycle, he had the pistols with him, easy to conceal. Undoubtedly, he wouldn't have left his pistols on his motorcycle. He would have taken those in with him. And so we have additional facts that go beyond just the name of the offense or the type of the offense. As to regularity, there are different ways that you can look at it. You have regularity as to perhaps three offenses if you consider the six months that the girlfriend said as part of regularity. And you're looking at a year-long as the temporal proximity question. Or you can look at them together and say you have three instances at a six-month mark, plus you're dealing with a six-month temporal proximate cause. There's another way you can also look at it. He had this firearm, the same firearm six months earlier. He had the same firearm when the police arrested him on April of 2017. There's no indication that he gave that firearm up or anything like that. So not only did he have it on six months earlier, he had it five months, 29 days earlier, five months, 28 days earlier, five months, 27 days earlier. This is not a consumable commodity like drugs. This is a firearm. He's not going to use it once and then it vanishes. Thus, there's not going to be a need to constantly go out and buy new firearms. As far as temporal proximity, as I said, Mr. Garcia spends much of his time emphasizing one year. But really, when you take the girlfriend's statement, we're talking about a six-month gap. And do you accept the premise that the outer boundary is nine months? I mean, what about Rotor? I mean, that was five years, wasn't it? Yes, Your Honor, Rotor was five years. In fact, what the motto said, it noted nine months, but it explained that the general consensus is that the tipping point essentially is one year. And so when we're on, albeit if we're talking about the outer bounds, what Mr. Garcia alleges, we're still slightly inside that one-year period. But if we talk about what Mr. Garcia's girlfriend said, we're within six months. Wasn't the nature of her testimony that for the last six months of that, he basically had the gun every day, it just wasn't out? That's how I would interpret the testimony, yes, Your Honor. Okay. So what we have is we have, I would suggest, a fairly strong showing of similarity. We have regularity, at least for the last six-month period. And we have temporal proximity. There was a six-month gap. But that gap's fine. Under Moore, there was a six-month gap. Under Caldwell, there was a year-and-a-half gap. I would suggest, actually, that Caldwell might be one of the most on-point cases. In Caldwell, there was a one-and-a-half-year gap, as I said. While there was evidence that he, Mr. Caldwell, distributed drugs for a three-year period, here we have a six-month period. We also have a history of possessing firearms. And there, the similarity was the same drug. Here we have chambered firearm. His wife was with him whenever police caught him with the drugs. Here, his girlfriend was with him. And it was in the same city. In light of Caldwell, in light of Wendell, the government would submit that Mr. Garcia hasn't shown error, or at the very least, he hasn't shown plain error. Unless there are any further questions on the relevant conduct issue, I'll briefly touch on the substance of reasonableness. Mr. Garcia's main argument, at least an oral argument, has been the statistics of the Sentencing Commission, but what this court has said is, you don't look at statistics in a vacuum. For purposes of evidence 35-387, you have to look at people who are similarly situated to the defendant. Mr. Garcia has had an extensive criminal history, much of it which involves gun. Things like his first conviction, possessing a firearm at school. He was involved in a drive-by shooting. He pointed a firearm at two undercover police officers. He possessed stolen firearms, including a rifle and two pistols, as it turns out, eight years earlier. Then we get into what I would suggest is the relevant conduct here. He possessed two pistols, chamber-loaded. He possessed this rifle for six months. The PSR also indicates that he had arrests for being in possession of a firearm,  The district court considered all of these factors and concluded that a 96-month sentence was reasonable. That was within the realm of rational sentencing choices. Unless the court has any further questions, I'd ask that you affirm the sentence. Thank you. Just briefly, Your Honor, on the substantive reasonableness issue, the district court did not even touch on the factor of unwarranted sentencing disparity. What the Sentencing Commission statistics show is really a broad range nationwide of what courts are doing, and what they show is that, one, it's rare to vary at all. Two, the average length and percentage of variance in cases, in firearms cases, are well below this one. And although we don't know the criminal records of every single person, and there's no way to look all those things up, what we can see is that this is, again, a nationwide sample. And given that these are firearms cases, the danger to people, the danger of physical harm is high in these cases. So to have a variance of this size in a case like this, where nobody was hurt, nobody was shot, no firearms were discharged, shows that it is far above the median in what is normal in these types of cases. Was there any evidence presented to the district court of how far outside the statistical range his sentence was going to be? No. Okay. And is that because the court did it? So did he give, was anyone aware that this was going to happen? This is not a case where there was no notice per rule 32, because the PSR did mention those factors. The government did not request a variance. So to that extent, the defendant was taken by surprise. Thank you, counsel. Thank you, Your Honor. Case is submitted. Counsel are excused.